IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LINDA DAVILA and CATHY BENDER, individually and on behalf of those similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>BANK OF AMERICA, CORP. and MERRILL LYNCH, PIERCE, FENNER & SMITH INC.,<br><br>Defendants. | Case No. 24-cv-08526<br><br><br><br>JURY TRIAL DEMAND |

## CLASS ACTION COMPLAINT

Plaintiffs, Linda Davila ("Davila") and Cathy Bender ("Bender"), by and through her attorneys, Stowell & Friedman, Ltd., hereby file this Complaint against Defendants Bank of America Corp. ("Bank of America") and Merrill Lynch, Pierce, Fenner & Smith Inc. ("Merrill Lynch" or "the Firm") (collectively "Defendants") and in support state as follows:

1. Plaintiffs Linda Davila and Cathy Bender, both African American women and Financial Advisors ("FA"), bring this suit individually, and on behalf of classes of African American and female FAs who work or worked for Defendants, to challenge the intentional discrimination and disparate impact of Defendants' uniform, centralized practices including succession planning, teaming, and account distribution.

## JURISDICTION AND VENUE

2. Plaintiffs' claims arise under 42 U.S.C. § 1981. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343. This Court has supplemental jurisdiction over state law claims under 28 U.S.C. § 1367.

3. Diversity jurisdiction also lies under the Class Action Fairness Act, 28 U.S.C. § 1332(d), because the amount in controversy exceeds $5,000,000, and there is minimal diversity as Davila is a citizen of New York, Bender is a citizen of Tennessee, and Bank of America is a citizen of Delaware and North Carolina. Additionally, class members are citizens of states other than Delaware, North Carolina, and New York.

4. Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f)(3). Defendants' unlawful conduct took place nationwide, including in this District, and Defendants are headquartered and licensed to do business in this District.

**PARTIES**

5. Defendant Merrill Lynch, Pierce, Fenner & Smith Inc. ("Merrill Lynch"), is a full-service securities firm and broker-dealer, incorporated in Delaware and headquartered in New York. Merrill Lynch is engaged in the retail and institutional sale of securities, options contracts, and various other financial products. Merrill Lynch is the wholly owned subsidiary of Defendant Bank of America.

6. Defendant Bank of America Corporation is a financial services company incorporated in Delaware and headquartered in North Carolina that provides a variety of banking and investment services. Bank of America maintains offices and a significant presence in New York. Bank of America acquired Merrill Lynch in or around 2009.

7. Plaintiff Linda Davila is an African American woman and is a citizen of New York. Davila is employed at Merrill Lynch in New York City as a Senior Vice President, Wealth Management Advisor where she recently celebrated her 45th year of employment with the Firm.

8. Plaintiff Cathy Bender is an African American woman and is a citizen of Nashville, Tennessee. Bender is employed at Merrill Lynch in Tennessee as a Senior Vice President, Senior Financial Advisor and has been employed for approximately 36 years.

## FACTUAL BACKGROUND

### Merrill Lynch's Legacy of Discrimination

9. Merrill Lynch has a long and ongoing history of systemic, intentional discrimination against women and African Americans in its workforce.

10. Despite 50 years of litigation achieving often significant monetary relief for women and African Americans subjected to Merrill Lynch's discrimination, Merrill Lynch continues to implement practices that courts and arbitral panels have found discriminatory.

11. First, in 1973, the early days following the Civil Rights Act, litigation brought by the EEOC and Helen O'Bannon sought to reform Merrill Lynch's near-total refusal to hire women and African American FAs. *See O'Bannon v. Merrill Lynch*, No. 73-cv-0905 (W.D. Pa.). To resolve this class action, Merrill Lynch and the EEOC entered into a consent decree, agreeing, among other things, to increase the Firm's representation of African American and female FAs. Specifically, Merrill Lynch agreed to hiring goals for African American account executive trainees of 6.5 percent for five years and women to 25 percent.

12. Next, in the 1990s, having never implemented the consent decree, Merrill Lynch purported to adopt a voluntary affirmative action program, but failed to meet the modest goals it set for representation of women and African Americans.

13. Further litigation in the 1990's and 2000's continued to challenge these practices. In 1996, Merrill Lynch faced another class action discrimination lawsuit, which alleged that the Firm systematically denied women equal opportunities to earn income and advance to

3

management. *See Cremin v. Merrill Lynch*, Case No. 96-cv-3773 (N.D. Ill.). Among other things, the *Cremin* lawsuit challenged Merrill Lynch's discriminatory practices regarding the Firm's distribution of assets, resources, and other income-generating opportunities for female FAs. Every arbitration panel that heard the class-wide statistical evidence concluded that Merrill Lynch had engaged in a pattern or practice of sex discrimination driven by its exclusionary culture. The court-approved settlement of the *Cremin* lawsuit included reforms and dispute resolution mechanisms designed to apply to race as well as sex discrimination.

14. And in *McReynolds v. Merrill Lynch*, a class of African American FAs (including Bender as a class representative) challenged Merrill Lynch's teaming and account distribution policy as intentionally discriminatory against African American FAs by, among other things: (1) distributing lucrative client accounts to FAs based on membership in teams and pools, from which Merrill Lynch knows African Americans are largely excluded, and (2) relying on factors that have a disparate impact on African Americans and disproportionately benefit white FAs, including "by prescribing criteria that favor the already successful — those who may owe their success to having been invited to join a successful or promising team." *McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 672 F.3d 482, 490 (7th Cir. 2012). The Account Redistribution Policy also provides exceptions that favor whites and disfavor African Americans due to the Firm's racially hostile culture and racial stereotypes about African American FAs.

15. After the Seventh Circuit ordered *McReynolds* to be certified, Merrill Lynch agreed to a landmark settlement of $160 million for African American FAs and programmatic relief.

16. And even after the *McReynolds* settlement, Merrill Lynch has maintained its teaming, account distribution, and succession planning practices that Merrill Lynch knows and

4

intends for white men to form teams with white men and distribute accounts from white men to white men to appease customers and the white men who have come to expect the favored treatment.

17. Thus, almost fifty years after the EEOC put Merrill Lynch on notice of systemic race and sex discrimination, women and African Americans remain underrepresented in Merrill Lynch's employee population and continue to earn substantially less than their white male counterparts, and regularly endure discrimination and retaliation as a result of Merrill Lynch's discriminatory culture, practices, and policies.

**The McReynolds Settlement Secured the Promise of Long-Term, Good-Faith Negotiations Toward Reform, Which Davila and Bender Led**

18. Beyond historic monetary relief, the *McReynolds* settlement enacted significant programmatic relief tailored not merely to set mandatory targets or quotas but instead to bring management to the table with African American FAs for an ongoing dialogue toward lasting reform Merrill Lynch.

19. The *McReynolds* settlement established a Leadership Council consisting of a mix of African American FAs and complex directors tasked with sharing ideas, meeting with Merrill Leadership, organizing mentorship programs, reviewing progress in implementation of the settlement, and especially "review[ing] and provid[ing] input regarding policies concerning [account distributions], teaming and pooling." Executives were required to meet with the Leadership Council, including executives with authority over teaming and account distribution practices.

20. Another essential victory of the *McReynolds* settlement was Merrill Lynch's promise that it would "not require arbitration of any employment discrimination claims, except as individually negotiated."

5

21.  This provision not only preserved employees' right to access the courthouse, but it was the backbone of continued, good-faith negotiation between the Leadership Council and Merrill Lynch management.

22.  Both sides were aware that there was significant work to do to rectify ongoing intentional discrimination at the Firm. In particular, Defendants did not eliminate the teaming and succession planning practices that were shown to be discriminatory in *McReynolds*, and compensation, hiring, promotion, and attrition disparities between white men and their female and African American counterparts persisted.

23.  But with a framework that both created a channel to communicate and afforded meaningful leverage through Merrill's promise that employees would preserve their right to go to court, individuals like Plaintiffs Davila and Bender could roll up their sleeves and work cooperatively to achieve reforms instead of filing another lawsuit.

24.  Plaintiffs Davila and Bender relished this opportunity and for over a decade were leaders on the *McReynolds* Leadership Council. Davila and Bender devoted their precious time and resources to participation in and leadership on the Council, discussing solutions with other FAs and management, and mentoring FAs.

25.  Through these negotiations, Davila especially was able to successfully persuade her colleagues to *abstain* from litigation and instead drive change within the Firm through the Leadership Council. Her colleagues knew that these efforts were safe because if negotiations broke down they could always vindicate their rights in court.

**Defendants Have Reneged on the Promise of the *McReynolds* Settlement by Attempting to Close the Door to the Courthouse**

26.  Bank of America destroyed that framework for negotiations without notice or negotiation with affected employees.

6

27. On November 8, 2024, Bank of America distributed to certain of its employees a mandatory arbitration and class action waiver policy to certain employees of Bank of America and its subsidiaries, including Merrill Lynch. Davila received the distribution although Bender does not believe it was distributed to her.

28. The arbitration policy purports to require employees to "FOREVER WAIVE AND GIVE UP THE RIGHT TO HAVE A COURT OR A JURY DECIDE ANY COVERED CLAIMS," including, conspicuously, claims for "discrimination and/or harassment."

29. The policy also precludes Defendants' employees from organizing and filing a collective action to obtain a consent decree through litigations. Defendants' employees are now required to bring claims "in arbitration in an individual capacity only" and such arbitration "must be adjudicated on an individual basis, and may not be initiated or maintained on a class action, collective action, or non-individual representative action basis in court or arbitration."[1]

30. Defendants' policy, however, does not apply to "claims pending in court as of the date Bank of America distributes this Policy to employees."

31. This surprise move is a devastating repudiation of the *McReynolds* settlement's process for reform and conciliation and a slap in the face to people like Davila and Bender who have worked tirelessly to reform Merrill Lynch from within instead of filing more litigation.

32. By eliminating an essential element of the *McReynolds* settlement and revoking employees' leverage to vindicate their rights in court, Defendants have signaled to Davila,

---

[1] Congress has recognized the danger of such provisions. Responding to the widespread practice of forcing sexual harassment and assault victims to arbitrate their claims individually, in 2022, President Biden signed the bipartisan Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act of 2021. 9 U.S.C. § 401 *et seq.* The Act invalidates "predispute arbitration agreement[s] or predispute joint-action waiver[s]" for sexual harassment and assault disputes. 9 U.S.C. § 402. There is not yet a corresponding provision for race discrimination claims.

Bender and their colleagues that Defendants no longer desire to work with their African American and female employees to eradicate the ongoing discrimination and drive positive change.

33. Defendants' policy change has caused Davila, Bender, and their colleagues to lose faith in the process they designed, and it has shattered Davila, Bender, and their colleagues' belief in their employer's willingness to reform.

34. Thus, with heavy hearts, Davila, Bender, and their colleagues can no longer count on good-faith negotiations to end the ongoing discrimination and instead must bring this suit now, before the door to the courthouse closes forever.

### Defendants' Discriminatory Practices Harmed Davila, Bender, and Those Similarly Situated

35. Plaintiff Linda Davila, an African American woman, has enjoyed a long and distinguished career as a Financial Advisor at Merrill Lynch, recently celebrating her 45th year as an FA at the Firm. Her title is now Senior Vice President and Wealth Management Advisor.

36. Plaintiff Cathy Bender is an African American woman and is a citizen of Nashville, Tennessee. Bender is employed at Merrill Lynch in Tennessee as a Senior Vice President, Senior Financial Advisor and has been employed for approximately 36 years.

37. Davila and Bender began their careers as FA trainees, Davila in 1979, in the early days of the *O'Bannon* consent decree, and Bender in 1987.

38. Neither Davila nor Bender have received the same teaming opportunities as their white male peers. In the case of Davila, she was not invited to team with senior white FAs while her white male peers did, thereby bolstering their careers. For most of her career, Bender was similarly excluded from teaming opportunities and although she now has a team, it is not the

8

type of team that will provide Bender with an opportunity to inherit assets and bolster her career or retirement benefits.

39. Similarly, unlike their white male peers, neither Davila nor Bender were given leads or account distributions, even when distribution policies should have ensured they both should have received accounts.

40. Persevering despite these obstacles, both Davila and Bender have been champions of reform during their tenure, hoping to clear the way for African American and female FAs that followed them to have equal opportunities that they were consistently denied.

41. Throughout Davila and Bender's 45 and 36 years at Merrill Lynch, respectively, they have been champions of the women and minorities working at the Firm to which they have dedicated their careers. Bender was a class representative in *McReynolds*, and both Davila and Bender instigated significant changes through their work on the *McReynolds* Leadership Council and as tireless advocates against discriminatory practices. But in their careers, they have also observed and been harmed by Merrill Lynch's stubborn insistence on clinging to many of the same discriminatory practices that plagued Davila when they joined the Firm decades ago.

42. But consistent with Merrill Lynch's firm-wide recalcitrance to abandon practices it has long known and intended to be discriminatory, Merrill Lynch has continued to maintain discriminatory practices that intentionally discriminate against and disparately impact women and African Americans including Davila and Bender.

43. Even today, despite 50 years of litigation, Davila's Park Avenue office in Manhattan has only three African American FAs out of approximately 150. Similarly, the representation of African American FAs in Bender's office is no high than when she joined the Firm.

9

44.     Despite their enormous success as FAs, Davila and Bender continue to be excluded from lucrative teams because of their race and sex while their less-qualified white and male colleagues join teams.

45.     Similarly, Davila and Bender have been denied lucrative account distributions because of their race and sex.

46.     Because of Defendants' actions, Davila, Bender and those similarly situated have suffered serious financial, reputational, and emotional harm.

47.     The actions alleged herein were done with malice, fraud, and oppression, and in reckless disregard of Plaintiffs' rights, and Plaintiffs and those similarly situated are thus entitled to recover punitive damages from Defendants.

## CLASS ALLEGATIONS

48.     Plaintiffs bring this action on behalf of themselves and all others similarly situated as a class action pursuant to Rule 23(b)(2), (b)(3), and (c)(4) of the Federal Rules of Civil Procedure. Plaintiffs challenge Merrill Lynch's uniform polices regarding succession planning, account distribution, teaming, and compensation.

49.     Plaintiffs Davila and Bender seek to represent a class of:

   a. All African American Financial Advisors who are or were employed by Merrill Lynch from January 18, 2023 to present, excluding individuals who are class members in *Council v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, NO. 3:24-cv-534 (M.D. Fla.).

50.     Plaintiff Davila also seeks to represent subclasses of:

   a. All African American Financial Advisors who are or were employed by Merrill Lynch in New York state from January 18, 2023 to present who are

not class members in *Council v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, NO. 3:24-cv-534 (M.D. Fla.).

b. All African American Financial Advisors who are or were employed by Merrill Lynch in New York City from January 18, 2023 to present who are not class members in *Council v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, NO. 3:24-cv-534 (M.D. Fla.).

51. Plaintiff Davila seeks to represent a class of:

a. All female Financial Advisors who are or were employed by Merrill Lynch in New York State from January 18, 2023 to present.

52. Plaintiff Davila also seeks to represent a subclass of:

a. All female Financial Advisors who worked for Merrill Lynch in New York City from January 18, 2023 to present.

53. The above-described classes and subclasses of African-American and female employees and former employees are so numerous and geographically spread that joinder of all members is impracticable

54. There are questions of law and fact common to the classes, and those questions can and should be resolved in a single proceeding that furthers this litigation.

55. The claims alleged by Plaintiffs are typical of the claims of the classes.

56. Plaintiffs will fairly and adequately represent and protect the interests of the classes.

57. The proposed classes meet the requirements for certification under Rule 23(b)(2) and/or Rule 23(b)(3). The questions of law and fact common to the members of the classes predominate over any questions affecting only individual members, and a class action is superior

11

to other available methods for the fair and efficient adjudication of the controversy. Fed. R. Civ. P. 23(b)(3).

58. Alternatively, the issues of determining liability and equitable relief are appropriate for issue certification under Rule 23(c)(4), as are other common issues.

## COUNT I

### RACE DISCRIMINATION IN VIOLATION OF 42 U.S.C. § 1981
### (Race Class)

59. Plaintiffs, individually and on behalf of all others similarly situated, reallege the above paragraphs and incorporate them by reference as though fully stated herein.

60. Section 1977 of the Revised Statutes, 42 U.S.C. § 1981, as amended, guarantees all persons the same right to make and enforce contracts. The term "make and enforce" contracts includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of contractual relationship.

61. Defendants subjected Plaintiffs and all others similarly situated to intentional racial discrimination in violation of 42 U.S.C. § 1981.

## COUNT II

### RACE DISCRIMINATION IN VIOLATION OF
### THE NEW YORK STATE HUMAN RIGHTS LAW
### (Davila and New York Race Class)

62. Plaintiff Davila, individually and on behalf of all others similarly situated, realleges the above paragraphs and incorporates them by reference as though fully stated herein.

63. Defendants maintain a substantial corporate presence in New York, including employing Plaintiff Davila in New York City.

64. The New York State Human Rights Law ("NYSHRL"), NY Exec. Law § 290, *et seq.*, establishes that it is unlawful, because of an individual's race, "to bar or to discharge from

12

employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment." N.Y. Exec. Law § 296(1)(a).

65. By its conduct as alleged herein, Defendants unlawfully discriminated against Plaintiff Davila and those similarly situated in violation of NYSHRL, under both disparate treatment and disparate impact theories of liability.

66. Defendants intentionally maintained racially discriminatory employment practices and policies, including but not limited to succession planning, teaming, and account distribution practices that also had a disparate impact on African American employees who worked for Merrill Lynch in New York.

67. Plaintiff Davila and all others similarly situated have suffered damages as a result of Defendants' violation of the NYSHRL.

## COUNT III

### RACE DISCRIMINATION IN VIOLATION OF THE NEW YORK CITY HUMAN RIGHTS LAW
(Davila and New York City Race Subclass)

68. Plaintiff Davila, individually and on behalf of all others similarly situated, realleges the above paragraphs and incorporates them by reference as though fully stated herein.

69. Defendants maintain a substantial corporate presence in New York City, including employing Plaintiff Davila in New York City.

70. The New York City Human Rights Law ("NYCHRL"), NYC Admin Code § 8-101, *et seq.*, establishes that it is unlawful, because of an individual's race, "to bar or to discharge from employment such person," or to "discriminate against such person in compensation or in terms, conditions or privileges of employment." NYC Admin Code § 8-107.

71. By their conduct as alleged herein, Defendants unlawfully discriminated against Plaintiff Davila in violation of NYCHRL, under both disparate treatment and disparate impact theories of liability.

72. Defendants maintained racially discriminatory employment practices and policies, including but not limited to succession planning, teaming, and account distribution practices that had a disparate impact on African American employees who worked for Merrill Lynch in New York City.

73. Plaintiff Davila and all others similarly situated have suffered damages as a result of Defendants' violation of the NYCHRL.

## COUNT IV

### SEX DISCRIMINATION IN VIOLATION OF THE NEW YORK STATE HUMAN RIGHTS LAW
(Davila and New York Gender Class)

74. Plaintiff Davila, individually and on behalf of all others similarly situated, realleges the above paragraphs and incorporates them by reference as though fully stated herein.

75. Defendants maintain a substantial corporate presence in New York, including employing Plaintiff Davila in New York City.

76. The New York State Human Rights Law ("NYSHRL"), NY Exec. Law § 290, *et seq*., establishes that it is unlawful, because of an individual's sex, "to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment." N.Y. Exec. Law § 296(1)(a).

77. By its conduct as alleged herein, Defendants unlawfully discriminated against Plaintiff Davila and those similarly situated in violation of NYSHRL, under both disparate treatment and disparate impact theories of liability.

78. Defendants maintained sex-based discriminatory employment practices and policies, including but not limited to succession planning, teaming, and account distribution practices that had a disparate impact on female employees who worked for Merrill Lynch in New York.

79. Plaintiff Davila and all others similarly situated have suffered damages as a result of Defendants' violation of the NYSHRL.

## COUNT V

### SEX DISCRIMINATION IN VIOLATION OF
### THE NEW YORK CITY HUMAN RIGHTS LAW
### (Davila and New York City Gender Subclass)

80. Plaintiff Davila, individually and on behalf of all others similarly situated, realleges the above paragraphs and incorporates them by reference as though fully stated herein.

81. Defendants maintain a substantial corporate presence in New York City, including employing Plaintiff Davila in New York City.

82. The New York City Human Rights Law ("NYCHRL"), NYC Admin Code § 8-101, *et seq*., establishes that it is unlawful, because of an individual's sex, "to bar or to discharge from employment such person," or to "discriminate against such person in compensation or in terms, conditions or privileges of employment." NYC Admin Code § 8-107.

83. By their conduct as alleged herein, Defendants unlawfully discriminated against Plaintiff Davila in violation of NYCHRL, under both disparate treatment and disparate impact theories of liability.

84. Defendants maintained racially discriminatory employment practices and policies, including but not limited to succession planning, teaming, and account distribution practices that had a disparate impact on female employees who worked for Merrill Lynch in New York City.

15

85.     Plaintiff Davila and all others similarly situated have suffered damages as a result of Defendants' violation of the NYCHRL.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that this Court find in their favor and against Defendants as follows:

a.     Declare that the acts and conduct of Defendants violate 42 U.S.C. Section 1981, the New York City Human Rights Law, and the New York State Human Rights Law;

b.     Declare that Defendants engaged in a pattern and practice of racial discrimination and certify a class of persons similarly situated to Plaintiffs who are eligible for relief;

c.     Order appropriate equitable and injunctive relief and diversity initiatives to remedy the discrimination and an elimination of mandatory arbitration and class-action waivers;

d.     Award Plaintiffs Davila and Bender and all others similarly situated the value of all compensation and benefits lost as a result of Defendants' unlawful conduct;

e.     Award Plaintiffs Davila and Bender all others similarly situated the value of all compensation and benefits they will lose in the future as a result of Defendants' unlawful conduct;

f.     Award Plaintiffs Davila and Bender and all others similarly situated compensatory damages;

g.     Award Plaintiffs Davila and Bender and all others similarly situated punitive damages;

h.     Award Plaintiffs Davila and Bender and all others similarly situated a common fund for make whole relief and statutory, compensatory and punitive damages;

i.     Award Plaintiffs Davila and Bender and all others similarly situated prejudgment

interest;

   j. Award Plaintiffs Davila and Bender and all others similarly situated attorneys' fees, costs and disbursements;

   k. Award Plaintiffs Davila and Bender and all others similarly situated such other make whole equitable, injunctive and legal relief as this Court deems just and proper to end the discrimination and fairly compensate the class.

## DEMAND FOR JURY TRIAL

  Plaintiffs hereby demand a jury trial as provided by Rule 38(a) of the Federal Rules of Civil Procedure.

Dated: November 8, 2024

        Respectfully submitted

        STOWELL & FRIEDMAN, LTD.

        By: /s/ Jennifer S. Gilbert

Jennifer S. Gilbert
Linda D. Friedman (pro hac vice to be requested)
Suzanne E. Bish (pro hac vice to be requested)
George S. Robot (pro hac vice to be requested)
**STOWELL & FRIEDMAN, LTD.**
303 W. Madison St., Ste. 2600
Chicago, IL 60606
Phone: (312) 431-0888
lfriedman@sfltd.com
sbish@sfltd.com
grobot@sfltd.com